Brenda M. MIETH and Dianne K. Rawlinson, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

E. C. DOTHARD, Individually and in his official capacity as Director of the Department of Public Safety, his agents, servants, assigns, and successors in office, et al., Defendants.

Civ. A. No. 75–433–N.

United States District Court,
M. D. Alabama, N. D.

June 28, 1976.

Probable Jurisdiction Noted

Nov. 29, 1976.

See 97 S.Ct. 483.

John L. Carroll, Pamela S. Horowitz, Joseph J. Levin, Jr., Morris S. Dees, Jr., Montgomery, Ala., for plaintiffs.

Larry R. Newman, Asst. Atty. Gen., State of Alabama, Montgomery, Ala., David

G. Flack, State Dept. of Corrections, Montgomery, Ala., for the Board of Corrections and its members.

E. Ray Acton, Sp. Asst. Atty. Gen. of Ala., Montgomery, Ala., for defendants Dothard, Frazer, Adams, Wilson, Anderson, Alabama Peace Officers Standards and Training Commission, Hobbie, Wright, Kentrell, Cooper, Hearn, Wilkins and Jackson.

Before RIVES, Circuit Judge, and JOHNSON and VARNER, District Judges.

PER CURIAM:

## STATEMENT OF THE CASE

■ This class action is brought by two women whose applications for employment with the Department of Public Safety and the Board of Corrections of the State of Alabama were denied on account of their failure to meet minimum weight and height requirements. Plaintiffs contend that these height and weight requirements and the assignment policies of the Board of Corrections are sexually discriminatory, and they seek to bring this lawsuit on their own behalf and on behalf of all women who might be employed or are applicants for employment as state law enforcement officers as that term is defined by Alabama Code, Title 55, § 373(103) (1973 Supp.).[1] Alternatively, plaintiffs seek to represent all women who might be employed or are applicants for employment with the Department of Public Safety for the position of State Trooper and all women who are employed, might be employed, or are applicants for employment with the Board of Corrections for the position of Correctional Counselor, Correctional Counselor Trainee, or Correctional Officer. Under the first definition of plaintiffs' class, jobs in law enforcement agencies other than the Department of Public Safety and the Board of Corrections would be affected. Evidence submitted to this Court, however, has involved only the positions of Correctional

Counselor with the Board of Corrections and State Trooper with the Department of Public Safety. Because the merits of this sex discrimination claim turn significantly upon the nature of the employment duties, this Court rejects the broad definition submitted by the plaintiffs and certifies the alternative, more narrow, one.

Defendants in this case are E. C. Dothard, Director of the Department of Public Safety; the Alabama Board of Corrections and its individual members; Judson Locke, Commissioner of the Board of Corrections; Stanley Frazer, Director of the Alabama Personnel Board; the Alabama Personnel Board and its individual members; and the Alabama Peace Officers' Standards and Training Commission and its individual members.

Plaintiffs' claims arise under the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e–2. The amount in controversy exceeds $10,000 exclusive of interests and costs. Jurisdiction is provided by 28 U.S.C. §§ 1331, 1343(3) and 42 U.S.C. § 2000e–5(f). Because a statute and administrative orders of the State of Alabama are challenged on constitutional grounds, and injunctive relief is sought against state officials, a three-judge court has been convened pursuant to 28 U.S.C. § 2281. The submission of this case is upon the briefs and the evidence presented by the depositions, interrogatories and other documents of the parties.

## FINDINGS OF FACT

### A. State Troopers

The Department of Public Safety of the State of Alabama was created by the legislature primarily to enforce the state's traffic laws. See Alabama Code, Title 36, § 58(58) (1958). The Department is divided into divisions which include the following: (1) administrative division, (2) highway patrol division, (3) driver's license division,

---

1. This section reads: "Law-enforcement officer" means and includes a policeman, deputy sheriff, deputy constable, and other official who has authority as such official to make arrests. It includes Alabama state troopers or members of the state department of public safety, and the Alabama board of corrections.

and (4) service division. *Id.* § 58(56). A director, appointed by the Governor, serves at the pleasure of the Governor as head of the department. *Id.*, § 58(54). It is the duty of the director to appoint all employees of the department, subject to the rules of Alabama's merit system law. *Id.*, § 58(57). The merit system announcement for the position of State Trooper (formerly the highway patrol division) requires the following qualifications:

(1) Graduation from a standard senior high school or GED certificate.

(2) Possession, upon appointment, of a valid Alabama driver's license.

(3) Passage of a physical examination equivalent to that established by the United States Army.

(4) Measure at least 5 feet, 9 inches in height without shoes and weigh at least 160 pounds without clothing.

(5) Sound teeth and vision correctible to 20/20, free from color blindness.

(6) Be between the ages of 21 and 36 years.

(7) Must never have been convicted of a felony or a misdemeanor involving either force, violence, moral turpitude or serious traffic violations.

Height and weight limitations have been a longstanding requirement for the job of State Trooper. While this requirement is an administrative one, the Director of the Department of Public Safety has testified that he is unsure as to how the requirements were developed or why these particular heights and weights were chosen. No study or test has ever been conducted by the department to determine what specific skills required of a State Trooper can be performed only by a 5'9", 160 pound person. Applicants who meet these physical qualifications are given a written exam and then placed on a register according to their exam grade. Appointment to the position of State Trooper is made from the top three names on this register.

The job of a State Trooper is described in the merit system announcement as follows:

A State Trooper enforces state laws and regulations, especially traffic laws. He patrols an assigned area in a patrol car; uses two-way telephone equipment; gives assistance to motorists; stops trucks to determine compliance with state and federal regulations; directs traffic, investigates accidents, gives first aid and safeguards property; investigates crimes or complaints, makes reports of findings; arrests law violators; appears in court as a witness; assists other law enforcement agencies; gives directions to tourists; watches for and corrects or reports hazards to safe driving. He may administer drivers' license examinations or do other police work as required.

The director of the department estimates that 75 to 90 percent of the time of the State Trooper is taken up with traffic enforcement. Much of this time is spent alone, patrolling the rural highways of Alabama without the availability of back-up. Unquestionably, the job is hazardous. Because of these hazards, the director has testified that he believes that physical strength is very important in relation to the performance of the job. Specific incidents where strength would come into play would be arresting an uncooperative individual, rescuing a person pinned underneath a car, or removing heavy objects obstructing the highway. No test for physical strength is given, however, in the State Trooper selection process. The Department does not actively recruit women for the position of State Trooper in spite of the fact that the director feels that, although women should not be assigned to the rural highways, they could serve as drivers' license examiners, investigators and safety instructors. In the present force of 659 State Troopers, there are no women employed. To the best knowledge of the director, only four women are presently on the list of 1,627 names in the register to become State Troopers.

Brenda Mieth is a 28-year-old female who is 5'6" in height and 132–133 pounds in weight. Ms. Mieth is a graduate of high school and the Monroe Business College and from 1973 to the present has been taking courses dealing with law enforcement at Troy State University and Prince George's

Community College in Maryland. On October 23, 1975, Ms. Mieth made application to the Alabama Personnel Board for employment by the Department of Public Safety in the position of State Trooper. The Personnel Board, on October 30, 1975, mailed Ms. Mieth a notice that her application was unacceptable for failure to meet the minimum weight requirements. Apparently, Ms. Mieth meets all other job prerequisites except the height limitation which was not mentioned in the notice.

After learning of her rejection, Ms. Mieth obtained a personal interview with Colonel E. C. Dothard, the Director of the Department of Public Safety of the State of Alabama, and requested a waiver of the height and weight restrictions, citing her strong desire to be a State Trooper. Colonel Dothard refused this request, informing Ms. Mieth that he would never put a woman on the road because of the dangers involved. Before departing, the director, in a courtly gesture, presented Ms. Mieth with a certificate making her an "Honorary State Trooper."

Since the rejection of her application for employment by the Alabama Department of Public Safety, Ms. Mieth has sought in vain to secure employment with several law enforcement agencies in Alabama, Virginia and Maryland. She is presently employed in a security position by a private business firm at the rate of $3.00 per hour.

B. Correctional Counselors

The Board of Corrections of Alabama is vested with the authority of administering the state's correctional system. Alabama Code, Title 45, § 10(1) (1958). The board is composed of five members who must be residents and are qualified electors of the State of Alabama. Board members are appointed by the Governor with the advice and consent of the Senate for ten year terms. *Id.*, § 10(2). The board has the power to appoint all employees that are required for the performance of its duties,

id., § 10(4), and is required to appoint a commissioner who serves at the pleasure of the board. *Id.*, § 10(5). The commissioner is authorized to receive delegations of authority from the board and is given the power to appoint, with the approval of the board, two deputy commissioners. *Id.* All employees of the board, with the exception of the commissioner and deputy commissioners, are subject to Alabama's merit system of employment. *Id.*, § 10(4).

The board currently operates four major all-male penitentiaries—Holman Prison, Kilby Corrections Facility, G. K. Fountain Correction Center, and Draper Correctional Center. Additionally, the Board maintains Julia Tutwiler Prison for Women, the Frank Lee Youth Center, the # 4 Honor Camp, the State Cattle Ranch, and nine Work Release Centers, one of which is for women. The four all-male penitentiaries and Julia Tutwiler are designed as maximum security institutions to house maximum security prisoners. Facilities at these institutions are predominantly dormitories with communal showers and toilets which are open to the dormitories and hallways of the facility. An extensive farming operation is carried on at both Draper and Fountain outside the prison walls. This necessitates a large number of strip searches for contraband when prisoners re-enter the confines of the institution.

Conditions in Alabama's all-male penitentiaries have been found by a federal district court to constitute cruel and unusual punishment as they are "so bad as to be shocking to the conscience of reasonably civilized people."[2] Among the ills of the prisons are overcrowding, understaffing, unsanitary living conditions, lack of recreational and rehabilitative programs, and lack of inmate security. In view of this, the Court stated that "the rampant violence and jungle atmosphere existing throughout Alabama's penal institutions are no surprise."[3] The board has been enjoined by the Court from failing to implement fully minimum stan-

---

**2.** *James v. Wallace*, 406 F.Supp. 318, 329 (M.D. Ala.1976), quoting *Holt v. Sarver*, 309 F.Supp. 362, 372–373 (E.D.Ark.1970), *aff'd* 442 F.2d 304 (8th Cir. 1971).

**3.** *James v. Wallace*, 406 F.Supp. 318, 325 (M.D. Ala.1976).

dards specified by a court order. Among other things, the board must drastically increase the numbers of the custodial staff at each institution and must institute an affirmative hiring program designed to reduce and having the effect of reducing the racial and cultural disparity between the staff and the inmate population.

One of the various merit system positions in the Alabama Correction System is that of correctional counselor.[4] The entry level position for correctional counselor is that of correctional counselor trainee. The job description of a correctional counselor I is as follows:

Patrols prisons and prison yards; stands watch in halls, at gates, or in wall towers; makes regular reports to supervisors.

Supervises and keeps order among prisoners assigned to work in prison kitchens, shops, mills, laundries, or on farms.

Enforces regulations covering sanitation and personal care.

Inspects all traffic into and out of prison proper.

Maintains constant watch for and reports unusual conditions or disturbances; keeps firearms in readiness for use if necessary; takes required action in emergencies to prevent escapes or suppress disorder; assists in recapture of escaped prisoners.

Explains to inmates rules, procedures and services available at correctional institutions; counsels individual inmates regarding personal problems, educational and vocational opportunities and work assignments.

Evaluates inmate behavior and adjustment to a correctional environment; submits evaluation reports.

Instructs inmates in personal hygiene, discipline and proper etiquette.

Performs related work as required.

As the above job description indicates, correctional counselors are persons who are commonly referred to as prison guards.

Their duties primarily involve security rather than counseling.

To apply for this position, applicants must possess a valid Alabama driver's license, be a high school graduate or GED equivalent, be free from physical defects, be between the ages of 20½ years and 45 years at the time of appointment, and fall between the minimum height and weight requirements of 5'2", 120 pounds and the maximum of 6'10" and 300 pounds. There is no written examination for the position of correctional counselor trainee; the grade assigned each applicant is based on experience and education. Employment is competitive. When a position opens, the Board of Corrections makes a request to the State Personnel Office for three names from the register. If more than one position is being filled, one name is submitted for each additional position.

The selection process described above is qualified by one exception, Administrative Regulation Number 204, which allows for selective certification for appointment of either male or female employees from the State Personnel Department's registers. Institutional wardens and directors identify each institutional correctional counselor I position which they find requires selective classification. The following criteria are used to establish that selective certification is necessary:

A. That the presence of the opposite sex would cause disruption of the orderly running and security of the institution.

B. That the position would require contact with the inmates of the opposite sex without the presence of others.

C. That the position would require patrolling dormitories, restrooms, or showers while in use, frequently, during the day or night.

D. That the position would require search of inmates of the opposite sex on a regular basis.

---

4. This position replaces the former correctional officer position. Under a grandfather provision, employees hired as correctional officers are still designated as such. For purposes of this opinion the terms "correctional counselor" and "correctional officer" will be used interchangeably.

E. That the position would require that the Correctional Counselor Trainee not be armed with a firearm.

Regulation 204 is the administrative means by which the board's policy of not hiring women as correctional counselors in contact positions in all-male penitentiaries has been implemented. Women correctional counselors are not, however, precluded from serving in contact positions in the all-male institutions other than the penitentiaries. Contact positions are those which require personal interaction with inmates. A dormitory patrol would be a contact position whereas a guard tower surveillance would not.

The following charts submitted in the brief for defendant Judson Locke, the Commissioner of the Board of Corrections, give a breakdown by sex of the total correctional counselor/correctional officer/correctional counselor trainee force at each institution:

| NAME OF INSTITUTION | MALE | FEMALE | TOTAL | % MALE | % FEMALE |
|---|---|---|---|---|---|
| Alexander City Work Release | 7 | 0 | 7 | 100 | 0 |
| Atmore Work Release | 4 | 1 | 5 | 80.0 | 20.0 |
| Birmingham, Work Release | 5 | 2 | 7 | 71.5 | 28.5 |
| Childersburg, Work Release | 5 | 2 | 7 | 71.5 | 28.5 |
| Draper Correctional Center | 83 | 3 | 86 | 96.5 | 3.5 |
| G.K. Fountain Correctional Center | 89 | 5 | 94 | 94.7 | 5.3 |
| Holman Prison | 84 | 3 | 87 | 96.6 | 3.4 |
| Kilby Correctional Center | 67 | 2 | 69 | 97.0 | 3.0 |
| Mobile Work Release | 5 | 2 | 7 | 71.5 | 28.5 |
| Frank Lee Youth Center | 7 | 3 | 10 | 70.0 | 30.0 |
| Montgomery Work Release | 5 | 5 | 10 | 50.0 | 50.0 |
| Number 4 Honor Camp | 10 | 0 | 10 | 100 | 0 |
| Tutwiler | 5 | 21 | 26 | 19.2 | 80.8 |
| Wetumpka Work Release | 0 | 4 | 4 | 0 | 100 |
| Youth Development Officers at Frank Lee Youth Center | 3 | 3 | 6 | 50.0 | 50.0 |
| | 379 | 56 | 435 | 87.1 | 12.9 |

The total correctional counselor/correctional officer/correctional counselor trainee force in contact positions at the non-penitentiaries in the Alabama Prison System by sex is as follows: [5]

| NAME OF INSTITUTION | MALE | FEMALE | TOTAL | % MALE | % FEMALE |
|---|---|---|---|---|---|
| Alexander City Work Release | 7 | 0 | 7 | 100 | 0 |
| Atmore Work Release | 4 | 1 | 5 | 80.0 | 70.0 |
| Birmingham Work Release | 5 | 2 | 7 | 71.5 | 28.5 |
| Childersburg Work Release | 5 | 2 | 7 | 71.5 | 28.5 |
| Frank Lee Youth Center | 7 | 3 | 10 | 70.0 | 30.0 |
| Mobile Work Release | 5 | 2 | 7 | 71.5 | 28.5 |
| Montgomery Work Release | 5 | 5 | 10 | 50.0 | 50.0 |

**5.** There are some slight discrepancies between the figures stated in the plaintiffs' and defendants' briefs. The exact breakdown is difficult to determine, apparently due to the board's record keeping problems. The Court notes one obvious error in the computer print-out of employees supplied by the defendants in their answer to Plaintiffs' Interrogatory Number 4, filed April 8, 1976. Barbara Ruffin, a correctional counselor I at the Mobile Work Release Center, is listed as a male. For purposes of this decision, however, this Court will accept the figures stated in the Board of Corrections' brief filed May 3, 1976, as we are convinced that the errors contained therein are de minimis.

| NAME OF INSTITUTION | MALE | FEMALE | TOTAL | % MALE | % FEMALE |
|---|---|---|---|---|---|
| Number 4 Honor Camp | · 10 | 0 | 10 | 100 | 0 |
| Wetumpka Work Release | 0 | 4 | 4 | 0 | 100 |
| Youth Development Officers at Frank Lee Youth Center | 3 | 3 | 6 | 50.0 | 50.0 |
| | 51 | 22 | 73 | 69.9 | 30.1 |

Plaintiff Dianne K. Rawlinson is a 22-year-old female whose present height and weight are 5'3" and 115 pounds. Ms. Rawlinson possesses a valid Alabama Driver's license and she has no physical defects that would prevent her from functioning as a law enforcement officer. The educational credentials of Ms. Rawlinson are impressive and ideally suited for a career in corrections. After graduating from high school in 1971, Ms. Rawlinson attended the University of Alabama where she graduated in December, 1974, with a "B" average. Ms. Rawlinson's major course of study at the University was correctional psychology. This academic training was supplemented by research work for various professors in the Correctional Psychology Department and part-time employment with the Tuscaloosa City Police Department, Juvenile Division.

Prior to her graduation from the University of Alabama, Ms. Rawlinson applied with the Alabama Personnel Board for the position of correctional counselor trainee with the Board of Corrections. Ms. Rawlinson's application was rejected because she did not meet the minimum weight requirement of 120 pounds as provided by Alabama Code, Title 55, § 373(109) (1973 Supp.). This statute requires all applicants and appointees for law enforcement officers[6] in Alabama to meet the qualifications listed below:

(a) Age.—The applicant shall be not less than 21 nor more than 45 years of age at the time of appointment; provided, however, that for the purpose of calculating his age under this article, the time spent by any applicant on active duty in the armed forces of the United States of America, not exceeding four years, shall be subtracted from the actual age of such applicant who has attained the age of 40 years.

(b) Education.—The applicant shall be a graduate of a high school accredited with or approved by the state department of education or shall be the holder of a certificate of high school equivalency issued by general educational development.

(c) Police Training.—Prior to appointment, the applicant shall have completed at least 240 hours of formal police training, in a recognized police training school, which shall include the Federal Bureau of Investigation Police Training Academy, or another training school approved by the commission; provided, that an applicant may be provisionally appointed without having completed the police training herein prescribed subject to the condition that he shall complete such training within 9 months after provisional appointment and should he fail to complete such training, his appointment shall be null and void.

(d) Physical qualifications.—The applicant shall not be less than five feet two inches nor more than six feet ten inches in height, shall weigh not less than 120 pounds nor more than 300 pounds and shall be certified by a licensed physician designated as satisfactory by the appointing authority as in good health and physically fit for the performance of his duties as a law-enforcement officer.

(e) Character.—The applicant shall be a person of good moral character and reputation. His application shall show that he has never been convicted of a felony or a misdemeanor involving either force, violence or moral turpitude, and shall be accompanied by letters from three qualified voters of the area in which the applicant proposes to serve as a law-enforce-

---

6. For a definition of "law enforcement officer," see note 1 *supra*.

ment officer attesting to his good reputation.

In conjunction with its establishment of these minimum standards, the legislature created an Alabama Peace Officers' Standards and Training Commission, a body composed of seven members, four appointed by the Governor, one by the state chapter of the Fraternal Order of Police, one by the Alabama Peace Officers' Association and one by the Law Enforcement Planning Agency. This Commission is authorized in Section 373(109) to grant waivers of the physical qualifications upon a showing of good cause. The Commission is also given the duties of studying; obtaining data statistics, and information; and making reports concerning the recruitment, selection and training of law enforcement officers in the state and of reviewing periodically the minimum standards described for applicants and for appointees as law enforcement officers.

Testimony before this Court from Mr. James Jackson, Executive Director of the Alabama Peace Officers' Standards and Training Commission, reveals that no studies concerning the physical qualifications have been conducted by the Commission and that the Commission has never sought the advice of experts in the law enforcement field as to the pertinence of height and weight requirements to the job of law enforcement officer. The Commission has granted approximately four or five waivers of the height and weight restrictions, one of those being to a female applicant to the City Police Department of Gadsden, Alabama. The Department of Public Safety and the Board of Corrections, the two state agencies involved in this case, have never requested a waiver from the Alabama Peace Officers' Standards and Training Commission, and apparently have no stan-

dard procedure to inform the applicant of his or her right to request a waiver.[7]

After receiving her letter of rejection, Ms. Rawlinson sought further explanation. An employee of the Board of Corrections was contacted who informed Ms. Rawlinson that she could not be accepted as a correctional counselor trainee unless she met the minimum weight requirement. Ms. Rawlinson's next step was to file a complaint with the Birmingham office of the Equal Employment Opportunity Commission alleging that the state's height and weight restrictions were sexually discriminatory. No action was taken by the Commission, and on January 15, 1976, Ms. Rawlinson was given her "right to sue" letter.

C. Statistical Evidence

The latest United States Census[8] indicates that 52.75 percent of the total population of Alabama that is 14 years of age or older is female. Only 36.2 percent of these women are classified as being in the labor force, as compared to 69.1 percent of the men. Stated differently, females comprise only 36.89 percent of the total labor force in Alabama that is 14 years old or older. In the 20–44 year age bracket, the group comprising the potential labor pool for law enforcement officers in Alabama, the percentage of females in the labor force is 37.34 percent. As we have noted earlier there are no women employed as State Troopers in Alabama by the Department of Public Safety. This is not surprising as the 5'9" height and 160 pounds weight requirements screen virtually all women from the job. Only .68 percent of the women in the United States between the ages of 18–79 years surveyed in 1960–62 were 5'9" or more in height while 37.25 percent of their male counterparts grew to this level.[9] This same

7. The letter Ms. Rawlinson received from the State Department of Personnel made no reference to a waiver and neither did the card received by Ms. Mieth. Ms. Rawlinson has also testified that no one at the Board of Corrections mentioned the possibility of a variance.

8. 1970 Census, General Social and Economic Characteristics. Alabama, Table 46.

9. United States Department of HEW Public Health Services, National Center for Health Statistics, *Weight by Height and Age of Adults, United States 1960–1962*, Series 11, Number 14, May 1966, Table 3 (Hereinafter cited as *Height and Weight Report*). In the 18–44 year age bracket, 98.8 percent of the women would be excluded by a 5'9" height restriction.

survey reveals that 58.58 percent of the men and 22.66 percent of the women in the United States between the ages of 18–79 years weigh 160 pounds or more.[10] When heights and weights are combined, a 5'9" height and a 160 pound restriction would include 16.98 percent of the male population between the ages of 18–34 years but only .65 percent of the female population.[11]

Turning now to the Alabama Prison System, it has been established that women comprise 12.9 percent of the correctional counselor (and related) positions in the entire prison system and only 3.8 percent of the correctional counselor positions at the four all-male penitentiaries.[12] Of the total number of correctional counselors hired by the Alabama Prison System, 77.24 percent are employed in these four penitentiaries. The 5'2" requirement for the job of correctional counselor operates to exclude 33.29 percent of the women in the United States between the ages of 18–79, while excluding only 1.28 percent of the males.[13] The 120 pound weight restriction excludes 2.35 percent of the males and 22.29 percent of the females in this 18–79 age group.[14] When the height and weight restrictions are combined, approximately 99.76 percent of the men and 58.87 percent of the women meet both these physical qualifications.[15]

CONCLUSIONS OF LAW

■ Since Ms. Rawlinson has perfected the procedural steps that must be followed before bringing a claim pursuant to 42 U.S.C. § 2000e–2 (Title VII), her suit must be distinguished from Ms. Mieth's which arises only under 42 U.S.C. § 1983 for violation of a constitutional right. This distinction is not merely conceptual; important legal consequences now hinge upon whether the plaintiff's cause of action derives from the statutory proscription against discrimination in employment or the constitutional guarantee of equal protection. *Washington v. Davis,* —— U.S. ——, ——, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

■ Under Title VII, when an employment practice has a substantially disproportionate effect upon a protected minority, discriminatory purpose need not be proved. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Once a Title VII plaintiff has demonstrated a prima facie case of discrimination under this disproportionate impact analysis, the burden shifts to the employer to prove that the disqualifying employment practice has a "manifest relationship to the employment in question." *Id.* at 432, 91 S.Ct. at 854. Should the employer fail to meet this burden the plaintiff may prove that the challenged requirement is but a pretext for discrimination by showing that other selection devices which do not have a discriminatory impact would serve the employer's legitimate interest in "efficient and trustworthy workmanship." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Accord, Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

■ In cases where religion, sex, or national origin is a "bona fide occupational qualification (bfoq) reasonably necessary to the normal operation of that particular business or enterprise," employers are free under Title VII to treat their employees differently on the basis of these categories. 42 U.S.C. § 2000e–2 (1970).

Courts, however, have treated the bfoq doctrine as a narrow exception to the general rule that there must be equality of employment opportunities. In *Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385 (5th Cir.), *cert. denied* 404 U.S. 950, 92 S.Ct.

10. *Height and Weight Report,* Table 4.

11. *Height and Weight Report,* Tables 7–8, 15–16.

12. The percentages at each of these institutions are: Draper—3.5 percent; Fountain—5.3 percent; Holman—3.4 percent; and Kilby—3.0 percent.

13. *Height and Weight Report,* Table 3.

14. *Height and Weight Report,* Table 4.

15. *Height and Weight Report,* Tables 7–8, 15–16.

275, 30 L.Ed.2d 267 (1971), the Fifth Circuit held that being a female was not a bfoq for the job of flight cabin attendant. The district court in that case had held contrary for the following reasons: (1) its view of Pan Am's history of the use of flight attendants; (2) passenger preference; (3) basic psychological reasons for the preference; and (4) the actualities of the hiring process. See 442 F.2d at 387. Judge Tuttle, writing for the Fifth Circuit, rejected any notion that the business necessity test was nothing more than business convenience. The following standard was prescribed: "discrimination based on sex is valid only when the *essence* of the business operation would be undermined by not hiring members of one sex exclusively." *Id.* at 388. Applying this standard, the court found that the primary mission of an airline is to transport passengers safely from one place to another and that there was no evidence that having male flight attendants would jeopardize or lessen an airline's ability to accomplish this mission. *Id.*

Labeling a job as "strenuous" and then relying on the stereotyped characterization of women will not meet the burden of demonstrating a bfoq. *Weeks v. Southern Bell Telephone & Telegraph Co.,* 408 F.2d 228 (5th Cir. 1969). There must be some objective, demonstrable evidence that women cannot perform the duties associated with the job. *See id.* at 236.

■■■ The Supreme Court has recently held that this probing scrutiny by the courts into the employment decisions of executives and administrators under Title VII is not the appropriate analysis for alleged constitutional violations. *Washington v. Davis, supra.* The test under the Equal Protection Clause is not one of impact but one of intent. The fact that an employment requirement operates to exclude a disproportionately larger number of blacks than whites or women than men does not by itself make out a case of invidious discrimination. Only when the plaintiff proves that the discrimination was purposeful has the Constitution been violated. The court made clear, however, that evidence of a disproportionate impact is relevant to this question of intent since "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." —— U.S. at ——, 96 S.Ct. at 2049.

■■■ The height and weight requirements of the defendants in this case work a disproportionate effect upon the chances of a woman's obtaining a job as either a State Trooper or correctional counselor with the State of Alabama. The statistics show that the 5'2", 120 pound requirements for the position of correctional counselor in Alabama's Prison System exclude 41.13 percent of the female population while excluding less than one percent of the male population. Accordingly, the Court finds that, in the case of Ms. Rawlinson, plaintiff has made out a prima facie case of sex discrimination and that the Board of Corrections must now prove that the height and weight requirements are job related. *McDonnell Douglas Corp. v. Green, supra.* In the case of Ms. Mieth, the disproportionate impact is even more profound as almost no woman meets the 5'9", 160 pound requirements. Should the Court conclude that these physical qualifications are intended to exclude women, we must then apply the test of whether these qualifications are rationally related to a legitimate state interest in order to determine if they are violative of the Equal Protection Clause. See *Frontiero v. Richardson,* 411 U.S. 677, 691–692, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

**A. State Troopers**

■■■ Colonel E. C. Dothard, Director of the Department of Public Safety, testified that he feels that women should not be State Troopers. Considering these statements of Colonel Dothard, together with the statistics that show that almost all women are excluded by the 5'9", 160 pound physical qualifications, the Court finds that the challenged employment requirements were intended to be discriminatory. The question now is whether these height and weight minimums are sufficiently job related so as to be a legitimate interest of the state. Few cases have dealt with height

and weight requirements for jobs as police officers and other related law enforcement positions. In *Officers for Justice v. Civil Service Commission of City and County of San Francisco,* 395 F.Supp. 378 (N.D.Cal. 1975), a 5'6" height requirement for Q–2 patrol positions in the San Francisco Police Department was challenged as sexually discriminatory. Defendants attempted to justify this height requirement on the basis of a police department legal office survey of the relationship of height to assaultive conduct against police officers. The court found that: "While the data tends to indicate that the height of officers is inversely related to the frequency and severity of resistance of their arrest attempts, it is too inconclusive and inconsistent to support a finding for either position." 395 F.Supp. at 381. Finding that defendants had not sustained their burden of proving that height was a bfoq, the court enjoined the defendants from use of this qualification. *Id.* A California state court in *Hardy v. Stumpf,* 37 Cal.App.3d 958, 112 Cal.Rptr. 739 (1st Div. 1974) has similarly held that height and weight requirements for the position of police officer with the City of Oakland unlawfully discriminated against women. See also *Peltier v. City of Fargo,* 396 F.Supp. 710 (D.N.D.1975).

In *Smith v. Troyan,* 520 F.2d 492 (6th Cir. 1975), the court did find a rational support for the height requirement of 5'8" for East Cleveland police officers, basing its decision on the findings that (1) taller officers have a psychological advantage and (2) there is an advantage of height in effecting arrests and emergency aid. 520 F.2d at 496. On the other hand, no rational support was found for the 150 pound weight requirement as weight has no correlation to physical strength or to psychological advantage. It is noteworthy that East Cleveland used other tests to determine the strength of its applicants. 520 F.2d at 497.

Colonel Dothard contends that the exclusion of women for the job is intended for their protection and for the protection of the public. Neither of these contentions is sound, however. First, women do not need protectors; they are capable of deciding whether it is in their best interest to take unromantic or dangerous jobs. See *Weeks v. Southern Bell Telephone & Telegraph Co.,* 408 F.2d 228, 236 (5th Cir. 1969). In regard to the fear that the public will not be adequately protected, there is no evidence in the record that a woman cannot perform the duties of a patrol officer.

Plaintiffs have offered into evidence the testimony of T. W. White and Peter B. Bloch, a statistician and a research analyst, respectively, who collaborated in publishing the study "Police Officer Height and Selected Aspects of Performance." The conclusion of this study is that height differences in two police departments surveyed (Nassau County, New York and Dallas, Texas), have, with one exception, had no statistically significant effect upon performance.[16] The one exception was found in the Nassau County Department where shorter officers were found to have generated more citizen complaints.[17] Recommendations based on these conclusions were as follows: [18]

(1) Eliminate the height requirement and use a selection system based on the overall potential of the applicant for successful police work.

(2) Provide training for officers addressed to skill development in areas thought by police professionals to involve a height-performance relationship.

Peter B. Bloch also worked on another report published by the Police Foundation (a non-profit organization founded by the Ford Foundation) which studied the performance of women patrol officers in the Metropolitan Police Department of the District of Columbia. The conclusion of this

---

**16.** White, T. W. and Bloch, P. B., *Police Officer Height and Selected Aspects of Performance,* 6 (Police Foundation, October 1975).

**17.** *Id.* at 8. There was one complaint for every 16 man-years worked by officers who were 69 inches or shorter, compared to one complaint for every 73 man-years worked by taller officers.

**18.** *Id.* at 9.

report was that it was appropriate from a performance viewpoint to hire women for patrol assignments on the same basis as men.[19] The compilers of the report observed both men and women officers responding to calls for police assistance and encountering in like measure citizens who were dangerous, angry, violent, drunk, or upset. Similar results were achieved by both men and women. The principal difference observed between the sexes was that women patrol officers as a group made fewer arrests and gave fewer traffic citations than male police officers.[20] Mr. Bloch's works have been previously relied upon by this Court (Judge Johnson) in *Jordan v. Wright,* Civil Action No. 75–19–N (M.D.Ala., filed March 12, 1976), where it was found that "there is no reason from a performance viewpoint for not utilizing women in the Montgomery Police Department on the same basis as men." Mr. Bloch testified in this case that it was his opinion that if a person was able to perform effectively as a municipal police officer, he or she would also be able to perform effectively as a State Trooper. He also testified that driving a police vehicle is the only skill to which height is definitely related. It was his knowledge that the District of Columbia Police Department has concluded that officers who were shorter than 5'0" or taller than 7'0" could not adequately drive patrol vehicles. Mr. Bloch believes that a height requirement more restrictive than this would be non-purposive.

 Based on this evidence in the record, the Court holds that the 5'9", 160 pound height and weight requirements set by the Department of Public Safety for the job of State Trooper are not rationally related to the achievement of any legitimate state interest and therefore violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In so doing, this Court respectfully

differs with the United States Court of Appeals for the Sixth Circuit insofar as the height requirement is concerned.[21] The basis of our disagreement is apparently due to that court's reliance on evidence in the record before it of the psychological advantage of taller officers and their enhanced abilities in effecting arrests and emergency aid.[22] The credible evidence in this case is to the contrary. Tall officers do not hold an advantage over their smaller colleagues in job performance. As for the "psychological advantage," this Court doubts that such a finding, insofar as it is no measure of job performance, is sufficient constitutional justification for blanket exclusion from employment of all individuals under a specified height. One lesson the women's rights movement has taught us is that many long-held conceptions concerning the sexes have been found to be erroneous when exposed to the light of empirical data and objectivity.

### B. Correctional Counselors

#### 1. Height and Weight Requirements

 The 5'2", 120 pound height and weight requirements for the job of correctional counselor are just as infirm as the 5'9", 160 pound requirements used by the State Troopers. Mr. Judson Locke, Commissioner of the Board of Corrections, testified in support of these physical requirements. Commissioner Locke's sole contention concerning the job relatedness of these physical requirements was that they were related to strength. Undeniably, body height and weight have some relationship to strength, but we are unconvinced that a person below an arbitrarily defined level would invariably lack the necessary strength to perform the required tasks.

Plaintiffs have submitted testimony from two expert witnesses that height and weight requirements have absolutely no relationship to the duties performed by a cor-

19. Bloch, P. and Anderson, D., *Policewoman on Patrol,* 1 (Police Foundation, 1974).

20. *Id.* at 2.

21. See *Smith v. Troyan,* discussed *supra.*

22. In making these findings the court relied exclusively on the testimony of three officials in the defendant police department and not on the results of any objective studies. See 520 F.2d at 496.

rectional counselor. One of these experts is Mr. Raymond Nelson, who is presently Warden at the Metropolitan Correctional Center in Chicago, Illinois. Mr. Nelson has twenty years' experience in the corrections field, having held positions as Assistant Director of Corrections for the City and County of Denver, Colorado. In the prison presently under Mr. Nelson's supervision, there are no height and weight restrictions for correctional counselor other than the requirement that a person's height and weight be proportionate. A course in self-defense training is given each counselor after employment. Plaintiffs' other expert witness on height and weight of prison guards was Mr. C. Robert Sarver, a professor at the University of Arkansas at Little Rock in the Graduate School of Social Work and School of Law. Mr. Sarver is the former Commissioner of the Arkansas Department of Corrections and the Department of Corrections for the State of West Virginia. During his tenure with the West Virginia prisons (1966–1968), the department did not impose minimum height and weight requirements for the position of prison guard. Mr. Sarver has concluded from his experience as a prison administrator that there is no positive correlation between a person's height and weight and his or her ability to perform as a prison guard.

If strength is an important qualification for a prison guard, then the Board of Corrections should adopt a test for its applicants that does in fact measure strength. The crude rule of thumb provided by height and weight levels impermissibly restricts qualified individuals without giving them an opportunity to demonstrate their merit. Apparently the drafters of Alabama Code, Title 55, § 373(109) intended the 5'2", 120 pounds standards to be rebuttable. Testimony from Mr. James Jackson, Executive Director of the Alabama Peace Officers' Standards and Training Commission, indicates that the waiver provided for by the statute has developed into a remarkably informal and subjective administrative procedure:

Q. Would you outline for me, please, the procedure you have implemented pursuant to Section 7D for granting of a waiver?

A. The hiring agency, or an individual— if they have been rejected for some employment for the two sections, the height and weight may either in writing—no formal forms are filled out, just submit to the Commission in writing for us to either waive it, and I, generally—I say I generally, I do issue an administrative decision back to the hiring agency which requests this.

Q. What do you use as a basis for your own administrative decision as to whether to waive it in a particular case?

A. Just the regular—I am trying to think—like in a doctor's office, your height and weight according to your—

Q. (Interrupting) Do you use a particular height and weight chart?

A. No particular, no sir.

Q. Well, what kind of chart do you use? Do you have one you refer to all the time?

A. Well, I don't refer to the chart directly myself. I say as long as they meet, in my letter, in my administrative decision, they meet this requirement in fact.

Q. When you say, "meet this requirement," how do you spell it out in your letter?

A. Really, I don't know how I spell it out. I just tell them that this is what they can do.

This Court finds that, while a valid waiver provision may save Title 55, § 373(109) from being unlawful discrimination on the basis of sex, the facts have established that the Department of Public Safety has never sought to waive the height and weight minimums, nor did it inform the plaintiff Mieth in this case of her right to request a waiver. Moreover, the administrative practice of the Alabama Peace Officers' Standards and Training Commission in acting upon waiver requests hardly comports with fundamental fairness. Accordingly, the Court finds that

the height and weight requirements have been discriminatorily applied in the case of Ms. Rawlinson in violation of Title VII.

## 2. Regulation 204

■■■ The reason propounded by the prison administrators for Regulation 204 is that they feel that women would not be able to perform adequately and safely within the setting of an all-male penitentiary. The overcrowding, violence, and other deplorable conditions that led to the court order in *James v. Wallace, supra,* are cited in support of this view. Many of the prisoners (the state estimates approximately 20 percent) housed in the all-male penitentiaries have committed sexually related crimes. The prison administrators believe that the presence of women in an environment where there are no heterosexual outlets would unnecessarily arouse and possibly even incite the inmates. The prisoners' right of privacy is also advanced. Because shower and toilet facilities at the penitentiaries are communal, the naked bodies of the male prisoners would be exposed to female correctional counselors or vice versa in the case of female penitentiaries.

The state seemingly defeats its stated purpose for Regulation 204, however, by employing females in contact positions at all-male institutions other than the four large penitentiaries. At the Mobile Work Release Center (MWRC), a minimum security institution, seven correctional officers are assigned to supervise 46 inmates. Two of these seven correctional officers are women who perform the identical duties of their male colleagues, with the exception that naked searches and frisks of the inmates are performed by the male officers. While Mr. Tony Sewell, Director of the MWRC is of the opinion that women do not perform this job as well as men, he nonetheless rates one of the women as a good employee.[23]

Bill Gilmore, Director of the Frank Lee Youth Center (FLYC), has testified that six of the sixteen correctional counselors at the FLYC are women. The toilet and shower facilities at this institution are communal and open like those in the large penitentiaries. Duties of these women counselors include walking through the dormitories, making body counts during normal hours and after lights are out, making inspection rounds through the shower room area even during use, and, in some instances, participating in shakedowns that involve frisking and searching the bodies of the inmates. These are the identical duties of the male correctional officer. The position of the Board of Corrections in regard to the privacy of the inmates at the FLYC is totally inconsistent with the position taken at the large penitentiaries.

Testimony of plaintiffs' expert witnesses demonstrates the varying opinions in the corrections community concerning the privacy of inmates. Mr. C. Robert Sarver, whose credentials have been discussed, *supra,* believes that women guards do not infringe on the inmates' right to privacy any more than male guards. Mr. Ray Nelson, also previously mentioned, has testified that in his prison women perform exactly the same duties as men with only the exception of strip searches. Both Mr. Sarver and Mr. Nelson agree that the presence of women in all-male prisons contributes to the normalization of the prison environment which has an advantageous psychological effect upon the prisoners. A recent policy statement by the Federal Bureau of Prisons in fact states that:

> The Bureau of Prisons is committed to the goal of normalization as a part of improving the correctional facilities. This integration of staff of both sexes into all institutions will promote this development.

Federal Prison System, Police Statement No. 3713.7, dated January 7, 1976.

---

**23.** Mr. Sewell's opinion as to the abilities of women seems in large measure attributable to the performance of one female correctional counselor under his supervision. If a woman cannot or does not perform her assigned duties, she may be suspended or removed permanently from her job, an action Mr. Sewell has recommended in the case of this particular female employee. This is no reason, however, that all women cannot adequately perform.

This Court is of the opinion that this tension between the individual's right to employment without regard to his or her sex and the inmates' right to privacy can be resolved by selective work responsibilities among correctional officers rather than by selective job classifications. According to testimony given by Commissioner Locke, only a small percentage of the correctional counselor work force is involved in conducting systematic strip searches.[24] We are convinced that procedures may be arranged so as to alleviate much of the legitimate inmate concern for privacy, short of denying women the job. See *Reynolds v. Wise*, 375 F.Supp. 145, 151 (N.D.Tex.1974). Accordingly, this Court holds that Regulation 204, insofar as it denies women jobs as prison guards in all-male prisons, is violative of Title VII and the Equal Protection Clause.

## REMEDIES

In view of the above findings of fact and conclusions of law, the following relief will be granted:

1. Defendants will be enjoined from denying plaintiffs and the classes they represent the jobs of State Trooper and correctional counselor solely on the basis of their failure to meet minimum height and weight requirements.

2. The Board of Corrections of the State of Alabama will be enjoined from enforcing Administrative Regulation 204.

3. Defendants shall be required to assign, promote, and compensate all female State Troopers and correctional counselors on an equal basis with their male counterparts. This shall not preclude, however, selective work responsibilities for correctional counselors to respect the inmates' right of privacy.

4. Within thirty (30) days of the effective date of this Court's order in this case, defendants shall be required to implement a recruiting program specifically designed to inform women of their opportunity to become State Troopers with the Department of Public Safety and correctional counselor trainees with the Board of Corrections and to encourage women to apply for such positions. Such recruiting efforts shall stress the equal role of men and women in these positions and shall provide information as to how and where to apply, salaries, and fringe benefits.

5. Within six months of the date of this order, defendants shall be required to file with this Court a detailed report reflecting compliance with this Court's order in this cause.

This Court will not grant plaintiffs' request for preferential treatment of Ms. Mieth's and Ms. Rawlinson's job applications and for a preferential hiring scheme for all women. In this connection the Court takes judicial notice of the strong state interest in preserving the integrity of the merit system of employment and, furthermore, the Court is confident that women can successfully compete with men for these jobs on a competitive basis. Finally, the Court will stay resolution of plaintiffs' request for accumulated pay pending the decision by the United States Supreme Court in *Bitzer v. Fitzpatrick, cert. granted* December 15, 1975, 423 U.S. 1031, 96 S.Ct. 561, 46 L.Ed.2d 404, 44 U.S.L.W. 3358. *Bitzer* presents the question, controlling also in this case, of whether the Eleventh Amendment prohibits federal courts from awarding accumulated monetary relief against a state in favor of state employees who allege that they were victims of discriminatory state laws that violated Title VII of the 1964 Civil Rights Act as amended in 1972. Jurisdiction will be retained pending this stay.

An appropriate order will be entered accordingly.

---

24. The Commissioner estimated that at Fountain only 5–7 guards out of a total 18–20 performed strip searches, and at Draper only 4 out of 18–20.