579 So.2d 788 (1991)
Francis M. O'LOUGHLIN, Sheriff of Saint Johns County, Florida, Appellant,
v.
Evelyn PINCHBACK, Appellee.
No. 88-2480.
District Court of Appeal of Florida, First District.
May 8, 1991.
*790 Gayle Smith Swedmark of Parker, Skelding, McVoy & Labasky, Tallahassee, for appellant.
William Roberts, Jr. of Roberts & Davis, Jacksonville, for appellee.
NIMMONS, Judge.
The appellant/employer challenges a determination by the Florida Commission on Human Relations (Commission) that the appellee/employee was unlawfully discriminated against when she was terminated due to her pregnancy. We affirm.

THE FACTS
Evelyn Pinchback was employed as a correctional officer at the St. Johns County Jail between March, 1981 and July, 1982. As a correctional officer, Pinchback was responsible for booking and releasing male and female inmates, taking mug shots, obtaining fingerprints, delivering food and mail, and providing general security.
In March, 1982, Pinchback learned that she was approximately two months pregnant, anticipating delivery on October 14, 1982. She immediately informed her supervisor who told her to report to the main office downtown for reassignment, but was subsequently returned to the jail because the officer in charge had no knowledge of the proposed change in assignment. Pinchback was then reassigned as a booking officer in the county jail for approximately two months and then, due to her condition, was reassigned to the canteen where she performed typing, filing, and other clerical duties. During this time, Pinchback's employer made inquiry of Pinchback's physician regarding the latter's assessment of Pinchback's ability to perform her job in her condition. The physician replied that there was no medical reason why Pinchback could not continue working until her estimated delivery date, but declined to evaluate her safety within the parameters of her job classification.
In mid-July, Pinchback was informed by her immediate supervisor, Sergeant (now Lieutenant) Gail Threet, that she must take maternity leave, regardless of Pinchback's desire to continue working. Apparently, there was a misunderstanding because Threet reported to her supervisors that Pinchback agreed to the maternity leave. Pinchback attempted to set the matter straight in a meeting with Captain Janson, Threet, and herself. However, the confusion continued because on July 21, when Pinchback reported for her usual shift, she was informed that she was no longer on the payroll. A week later, by registered mail, Sheriff O'Loughlin notified Pinchback that she had been terminated, stating two reasons: first, that during her work assignments, her health and her expectant baby's health were in obvious danger; and second, that she could no longer perform the duties and responsibilities of a correctional officer. At no point prior to her termination had Pinchback been informed that she was regarded by her employer as being incapable of performing her duties, nor had she received any evaluations to that effect, or *791 been advised of any deficiencies in the performance of her duties.
Sergeant Threet, who had roughly the same small physical stature as Pinchback, testified that while on duty the correctional officers are essentially unarmed, and that if a disturbance were to occur, outside help would have to be called to the facility. Sergeant Threet also indicated that the correctional officers receive identical training and conceded that if confronted by a strong male prisoner, she would be unable to overpower him. The physical requirements for the position of correctional officer are, therefore, limited. Further, there is no medical evidence to indicate Pinchback was unable to perform her assigned duties when she was discharged.
Following her termination, Pinchback filed with the Commission a petition under Florida's Human Rights Act of 1977 (Sections 760.01-760.10, Florida Statutes (1983)) for relief from an unlawful employment practice. After an administrative hearing, the hearing officer found, via his recommended order, that an unlawful employment practice was committed by the employer when Pinchback was discharged on the basis of her pregnancy. This determination was upheld by the Commission in its order which is the subject of the instant appeal.

PRE-EMPTION
In Florida there is a long-standing rule of statutory construction which recognizes that if a state law is patterned after a federal law on the same subject, the Florida law will be accorded the same construction as in the federal courts to the extent the construction is harmonious with the spirit of the Florida legislation. Kidd v. City of Jacksonville, 97 Fla. 297, 120 So. 556 (1929); Massie v. University of Florida, 570 So.2d 963 (Fla. 1st DCA 1990); Holland v. Courtesy Corporation, 563 So.2d 787 (Fla. 1st DCA 1990).
It is undisputed that Florida's Human Rights Act is patterned after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. School Board of Leon County v. Weaver, 556 So.2d 443 (Fla. 1st DCA 1990). Section 760.10(1)(a), Florida Statutes, provides in part:
It is an unlawful employment practice for an employer to discharge ... any individual ... because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status.
In General Electric Company v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the Supreme Court held that discrimination on the basis of pregnancy was not sex discrimination under Title VII. However, in 1978, in response to the Gilbert decision, Congress amended Title VII by enacting the Pregnancy Discrimination Act of 1978 (PDA). 42 U.S.C. § 2000e (k). The PDA specifies that discrimination on the basis of pregnancy is sex discrimination, and therefore violative of Title VII.[1] Florida has not similarly amended its Human Rights Act to include a prohibition against pregnancy-based discrimination.
In California Federal Savings and Loan Association v. Guerra, 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) the Court discussed the ways in which a federal law can pre-empt a state statute. The Court said:
Federal law may supersede state law in several different ways. First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. *792 ... As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." [Citations omitted.]
Id. at 280-281, 107 S.Ct. at 689. In holding that a California statute which requires that employers provide female employees an unpaid pregnancy disability for up to four months was not preempted by Title VII and the PDA, the Court recognized that when Congress enacted the PDA, it intended to extend the principles and objectives sought to be achieved by Title VII to cover pregnancy. Id. at 288-289, 107 S.Ct. at 693.
Under a Guerra pre-emption analysis, Florida's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress by not recognizing that discrimination against pregnant employees is sex-based discrimination. The protections afforded by Title VII and the PDA cannot be eroded by the Florida Act which does not contain a similar provision. Thus, we conclude that the Florida Human Rights Act, specifically Section 760.10, Florida Statutes, is pre-empted by Title VII of the Civil Rights Act of 1984, 42 U.S.C. § 2000e-2 to the extent that Florida's law offers less protection to its citizens than does the corresponding federal law.

ANALYSIS
In cases of this nature, a plaintiff can assert that the employer's policy is facially discriminatory to which the employer may raise the affirmative defense of "bona fide occupational qualification" (BFOQ). The employee can also present an allegation that the employer's policy is facially neutral but has a disproportionate impact on a Title VII protected class. The employer can assert a business necessity defense to this allegation. Also, if the employee contends the employer's policy is facially discriminatory, the employer can present scientific evidence justifying the policy and demonstrate that it affects the offspring of its employees equally, to which the employee can then assert a case of neutral discrimination with a disproportionate impact. When a case of facially neutral discrimination is presented, an employer can assert a business necessity defense.
The employer in the case at bar asserted that Pinchback's dismissal was based on the affirmative defense of BFOQ. It must be noted, however, that the employer did not have a previously articulated policy per se regarding pregnant employees, nor was there evidence that a similar situation had ever arisen. We agree with the Commission that the heretofore described reassignments of Pinchback by her employer after she revealed her pregnant condition was symptomatic of the lack of any definitive policy regarding pregnant employees.
Title VII, Section 703(e)(1), which provides for the BFOQ defense, states that an employer may discriminate on the basis of "religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2 (e)(1). The Supreme Court has held that this defense is to be narrowly construed. Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).
One of the types of discrimination alleged in Dothard involved gender criteria for assignment as a correctional counselor in one of the maximum security prisons which required close proximity to the inmates. The gender-based criteria presented an instance of overt discrimination, as the policy was clearly discriminatory on its face. Thus, the BFOQ defense was available and the employer was required to prove that the job qualification related to the essence of the employer's business. *793 Since the penitentiaries in Alabama were particularly inhospitable and inmates in the male maximum security prisons were not segregated according to violent propensity and nature of offense, and since the estimated 20% of the sexual offenders were not separated from the rest of the prison population, the Court found that there was a BFOQ for the employer's gender criteria and upheld the statutory requirement.
This analysis is also applicable when an employee is discharged due to her pregnancy. According to International Union, United Automobile, Aerospace and Agriculture Implement Workers of America, UAW v. Johnson Controls, Inc., ___ U.S. ___, ___, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158, if an employer's gender-based fetal-protection policy is facially discriminatory, the employer's only defense is a BFOQ. Further, it has been held that the employer must show a direct relationship between the policy and the fertile or pregnant employee's actual ability to perform the requirements of her job. Hayes v. Shelby Memorial Hospital, 726 F.2d 1543, 1549 (11th Cir.1984). Notably, potential for fetal harm, unless the female's job performance is adversely affected, is irrelevant to a BFOQ defense. Id.
In Hayes, a pregnant x-ray technician, after informing her supervisor that she was pregnant, was fired, ostensibly for the protection of the fetus although the hospital had no formal fetal-protection policy. Under those facts, because the hospital neither contended that the pregnant employee would be unable to carry out her duties as an x-ray technician, nor proved that the employee's concern regarding her fetus adversely affected her job performance, the BFOQ defense was inapplicable.
In Johnson Controls, supra, the Supreme Court applied the BFOQ analysis in a situation involving a gender-based fetal-protection policy whereby the employer systematically excluded all pregnant or fertile women from certain toxic jobs within the workplace. Johnson Controls' fetal protection policy excluded all fertile or pregnant women from positions which involved any exposure to lead, a substance which creates a known hazard to fetuses in utero. The Supreme Court reiterated the well-settled principle of law that in order for a BFOQ to be asserted by an employer, the employee's gender or pregnancy must actually interfere with her ability to perform the functions of her job. In doing so, the Court concluded that its "essence of business" test articulated in Dothard, supra, is still applicable. The Court noted:
An employer must direct its concerns about a woman's ability to perform her job safely and efficiently to those aspects of the woman's job-related activities that fall within the "essence" of the particular business.
Johnson Controls, Inc., ___ U.S. at ___, 111 S.Ct. at 1207. Because the fertile female employees involved in the process of manufacturing batteries carried out the requirements of their job as efficiently as their male counterparts, and the employer did not present evidence that fear of prenatal injury renders fertile women employees incapable of performing in that process, the fetal-protection policy adopted by Johnson Controls did not meet the standard required to allow the employer to successfully assert a BFOQ.
In the case at bar, in applying a BFOQ analysis to the facts as earlier stated herein, it is clear that the employer cannot establish a BFOQ. Sergeant Threet, of the same small physical build as Pinchback, testified that if threatened, she would be unable to subdue a larger, more physically imposing male inmate. Consequently, neither physical prowess nor sheer strength can be justified, on the record before us, as a required qualification for the position as correctional officer. There was no evidence, medical or otherwise, that Pinchback, as a pregnant employee, could not perform the tasks she had previously been able to successfully accomplish prior to becoming pregnant. Additionally, the employer did not prove that Pinchback's concern about her unborn child adversely affected her job performance. Pinchback's behavior and assertions are, in fact, to the contrary, since she stated that she intended to remain employed until her anticipated *794 due date. She even reported for work after being informed that she was to take maternity leave. This employer's action of discharging its pregnant employee cannot be defended under a BFOQ analysis.
After an employee presents a prima facie case of facial discrimination, the employer can present evidence that its fetal protection policy is neutral by showing: (1) there is scientific proof that there is a substantial risk of harm to the unborn fetus of its pregnant or fertile women employees from exposure to toxic hazards in the workplace and (2) there is scientific evidence that men are not similarly at risk. Hayes, 726 F.2d at 1548. According to Hayes, the employer's burden of proving that its facially discriminatory policy is neutral is carried "by showing that the body of opinion believing that significant risk exists is so considerable `that an informed employer could not responsibly fail to act on the assumption that this opinion might be the accurate one.'" Id. (quoting Wright v. Olin Corporation, 697 F.2d 1172, 1196).
If the employer fails to satisfy its burden of persuasion that its policy is in practice neutral, it can still assert a BFOQ. However, if the employer successfully produces scientific evidence justifying its fetal-protection policy, the policy can then be considered neutral because it equally affects all the employees' unborn children. However, since only women are targeted, the neutral fetal-protection policy has a clearly disproportionate impact. To such facially neutral discrimination the employer may assert a business necessity defense.
Unlike the BFOQ defense, which is a statutorily created defense to facial discrimination, the business necessity defense is a judicially created defense to an employer's policy which is, at first glance, neutral, but has a disproportionate impact on a class protected under Title VII. The business necessity defense will automatically apply after an employer has proven that its fetal-protection policy is scientifically supported and is equal in its protection of all employees' offspring. Hayes, 726 F.2d at 1553.
Historically, the business necessity defense has applied in more traditional Title VII settings. For example, in Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court explained that Title VII sought to prohibit employment practices that are facially neutral but actually operate to discriminate against a class protected by Title VII. The Court indicated that the key to determine if the practice was prohibited was business necessity. If the practice in operation excludes a Title VII protected class and is unrelated to job performance, the practice is discriminatory and prohibited. Id. at 431, 91 S.Ct. at 853.
In Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), there was an allegation of facially neutral discrimination involving height and weight requirements necessary to become employed by the Alabama Board of Corrections as a correctional counselor in the prison system. The Supreme Court held that for a prima facie case of discrimination to be made, a plaintiff must only show that the standards at issue select applicants for employment in a discriminatory pattern. This shifts the burden to the employer to show that the requirements are job related. If that burden is sustained, the plaintiff may show that alternative means without a discriminatory effect are available which would serve the employer's interest. Id. at 329, 97 S.Ct. at 2726-2727. The Court found that the statutory height and weight requirements were prohibited by Title VII because the employer produced no evidence to demonstrate the requirements were job related.
Though this analysis is more difficult to equate in an instance where an employer's fetal-protection program is at issue because fetal protection appears unrelated to job performance, the defense is still applicable in cases where employers have legitimate concerns about the safety of its employees. See Hayes v. Shelby Memorial Hospital, 726 F.2d 1543 at 1552 (11th Cir.1984). The business necessity defense may be rebutted if the employee presents evidence of acceptable alternative *795 policies which will better promote fetal health by having a less adverse impact on one gender. Hayes at 1543. According to Hayes:
To avoid Title VII liability for a fetal protection policy, an employer must adopt the most effective policy available, with the least discriminatory impact possible.
Id. at 1553.
In Johnson Controls, Inc., ___ U.S. ___, 111 S.Ct. 1196, the Supreme Court summarized the business necessity inquiry as:
Whether there is a substantial health risk to the fetus; whether transmission of the hazard to the fetus occurs only through women; and whether there is a less discriminatory alternative equally capable of preventing the health hazard to the fetus.
Id. ___ U.S. at ___, 111 S.Ct. at 120. The Supreme Court found that Johnson Controls' policy was facially discriminatory and the lack of a malevolent motive did not render the policy neutral. Thus, the employer could not assert a business necessity defense.
In the instant case, it is clear that the business necessity defense is inapplicable. The policy or concerns addressed by the employer toward Pinchback's condition cannot be construed as facially neutral since they apply only to pregnant women. Further, the employer did not attempt to support its actions by presenting medical or scientific evidence that would indicate its policy of discharging pregnant women was justified. In fact, the only medical evidence in the record comes from Pinchback's physician who indicated that there was no reason she could not work until her baby was born. Moreover, the record does not satisfy the requirement that more acceptable alternatives existed which would serve the purpose of promoting the health of Pinchback's fetus or lessen the policy's impact on women. Thus, the employer's action cannot be defended by a business necessity.

REMEDY
As a correctional officer for St. Johns County, it is undisputed that Pinchback served at the will of the sheriff. Section 30.53, Florida Statutes, provides in pertinent part:
The independence of the sheriffs shall be preserved concerning ... selection of personnel, and the hiring, firing, and setting of salaries of such personnel... .
Section 30.07, Florida Statutes, which governs deputy sheriffs, states:
Sheriffs may appoint deputies to act under them who shall have the same power as the sheriff appointing them, and for the neglect and default of whom in the execution of their office the sheriff shall be responsible.
The employee contends that the proper remedy in this case is reinstatement to her former position. A similar issue was resolved in Lucas v. O'Loughlin, 831 F.2d 232 (11th Cir.1987). In that case, a deputy sheriff of St. Johns County sought reinstatement after prevailing in a Title 42, § 1983 action for wrongful discharge. The court noted, and the parties agreed, that a prevailing plaintiff in a wrongful discharge case is entitled to reinstatement absent unusual circumstances. Id. at 236 (quoting Donnellon v. Fruehauf Corp., 794 F.2d 598, 602 (11th Cir.1986); and Darnell v. City of Jasper, 730 F.2d 653, 655 (11th Cir.1984)). The unusual circumstances were that:
The sheriff's term, and therefore the term of the deputy, expired while the litigation was proceeding, and a new sheriff had been elected.
Lucas 831 F.2d at 236. Thus, the court held that reinstatement was not a proper remedy.
In School Board of Leon County v. Weaver, 556 So.2d 443 (Fla. 1st DCA 1990), the court addressed the issue of whether back pay is an available remedy for a plaintiff who prevails in a Title VII action against an employer for an unlawful employment practice. The court recognized that Florida's Human Rights Act, Sections 760.01-760.10, Florida Statutes, is patterned after Title VII of the Civil Rights *796 Act of 1964 which has been construed as providing a remedy of back pay to be awarded prevailing plaintiffs. However, in that case there was no evidence of any economic damages presented at the hearing and thus the Commission's award of back pay to the complainant was reversed.
In the case at bar, following the original hearing, the hearing officer recommended that Pinchback be reinstated to her position as a correctional officer. The Commission agreed with the recommendation and ordered the employee's reinstatement. At a separate hearing, the issue of back pay, benefits, and attorney's fees was resolved assuming that the order to reinstate Pinchback would be upheld.
The record indicates that Sheriff O'Loughlin is no longer the sheriff of St. Johns County. This being the case, it is clear that reinstatement is an inappropriate remedy at this time. However, the employee is entitled to an award of back pay, but a determination of when Sheriff O'Loughlin's term expired must be made in order to calculate the award of back pay and benefits.
Accordingly, we AFFIRM and REMAND for further proceedings consistent with this opinion.
BARFIELD and MINER, JJ., concur.
NOTES
[1] Section 701(k), the definitional section of Title VII, provides, in part:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title shall be interpreted to permit otherwise.