# Peace Corps Employment Policies for Pregnant Volunteers

The Pregnancy Discrimination Act (PDA) would prohibit the Peace Corps from implementing an across-the-board policy of terminating or reassigning volunteers solely because they become pregnant while assigned overseas, or because they have an abortion. A decision to terminate a pregnant volunteer must be based on a case-by-case assessment of the volunteer's ability to function effectively in her assignment while pregnant or after delivery of the child.

Under the PDA, the fact that a volunteer who has been terminated because of pregnancy chooses to have an abortion cannot be considered in a decision on her reapplication for service.

Even though a specific restriction in the Peace Corps' appropriation prohibits the use of its funds to perform abortions, so that the Peace Corps may not pay for the cost of an abortion for one of its volunteers, the PDA would require the Peace Corps to continue to pay travel and per diem expenses to volunteers evacuated to have an abortion, as long as it provides such compensation to other volunteers evacuated for comparable medical conditions. The Peace Corps must also allow volunteers to draw upon their accumulated readjustment allowance to pay for an abortion, if similar access is allowed for other medical expenses.

November 20, 1981

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, PEACE CORPS

This responds to your request for this Office's views on several questions about the Peace Corps' policies on hiring and reinstatement of volunteers who become pregnant while overseas and of pregnant volunteers who elect to have an abortion, and on reimbursement of travel and per diem expenses to volunteers evacuated to the United States for the purpose of obtaining an abortion. We conclude that the Pregnancy Discrimination Act would prohibit the Peace Corps from implementing any across-the-board policy of terminating volunteers who become pregnant while overseas or pregnant volunteers who elect to have abortions, but that in some limited circumstances termination or reassignment may be appropriate, on an *ad hoc* basis, because of the unique demands and constraints of Peace Corps service. We do not believe, however, that the Peace Corps may consider the fact that a volunteer who had been terminated because of pregnancy subsequently elected to have an abortion in reviewing that individual's application for reinstatement. With respect to the funding of abortion-related expenses, we conclude that the Peace Corps is not barred from using appropriated funds to pay travel costs and a per diem to volunteers who are evacu-

ated for the purpose of obtaining an abortion, and, in fact, that the Pregnancy Discrimination Act requires the Peace Corps to continue paying those costs, so long as travel and per diem expenses are paid to volunteers evacuated for other comparable medical disabilities.

## I. Background

Current Peace Corps policy provides for an *ad hoc* determination whether volunteers who become pregnant or pregnant volunteers who elect to have an abortion will be allowed to remain in their assigned countries. In determining whether a pregnant volunteer (including her spouse) should be allowed to remain in service, the Country Director looks at a variety of factors, including health hazards to the mother and child, the ability of the parents to support the child, and the prospects for continued effectiveness by the parents. A pregnant volunteer who elects to have an abortion may be separated, or returned to duty if the Country Director determines she will be able to serve effectively under the circumstances. Pregnant volunteers, volunteers with dependent children, and volunteers who have had abortions while in service do serve in the Peace Corps, although individuals who are pregnant or who have dependent children are not encouraged to become volunteers. Volunteers who choose to have an abortion are generally evacuated to the United States for the procedure. The Peace Corps pays travel expenses and a per diem to those volunteers who have an abortion, as it does for volunteers evacuated for other medical or surgical treatment.[1] Because of a prohibition in the Peace Corps' current appropriations authority against the use of appropriated funds to pay for abortions except where the life of the woman would be endangered or in cases of reported rape or incest, the Peace Corps does not now pay the costs of the abortion procedure itself. Volunteers may, however, draw upon accumulated readjustment allowance funds to pay for abortion procedures.[2]

You have asked us to address the following questions:

1. Can the Peace Corps terminate any volunteer who becomes pregnant while a volunteer because of pregnancy? If so, could such a policy be limited to single volunteers?

---

[1] Payment of medical and related expenses for Peace Corps volunteers is authorized by 22 U.S.C. § 2504(e) (1976), which provides that "[v]olunteers shall receive such health care during their service . . . as the President may deem necessary or appropriate . . ."

[2] Under the Peace Corps Act, codified at 22 U.S.C. § 2501–2523 (Supp. III 1979), volunteers are entitled to receive a readjustment allowance of $125 per month, payable on return of the volunteer to the United States. 22 U.S.C. § 2504(c). Amounts accrued as readjustment allowance may be paid to the volunteer, members of his family, or others during the period of the volunteer's service, "under such circumstances as the President may determine." The readjustment allowance is transferred on a monthly basis, to a noninterest bearing account until payment to the volunteer. For income tax purposes, the allowance is deemed paid to the volunteer when transferred to the fund from which the readjustment allowance is payable. *Id.*

2. Can the fact that a volunteer has a husband in-country be cause to allow a pregnant volunteer to remain in that status longer than she would if she were single?

3. Does payment for travel for a volunteer to return to Washington and per diem while here, leaving the payment for the abortion procedure up to the volunteer, comply with the legislative restriction on Peace Corps appropriations?

4(a). If a volunteer is terminated, asked to resign due to pregnancy, and subsequently obtains an abortion, can that fact be considered if she applies for readmission to the Peace Corps as a volunteer?

(b). Since a normal term for volunteers is two years, if the answer to (a) is "no," could the fact that a volunteer resigned more than once to have an abortion be considered upon her request for readmission?

## II. Requirements of the Pregnancy Discrimination Act

The Peace Corps' termination, reinstatement, and benefits policies for pregnant volunteers or volunteers who have an abortion must comply with the Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k) (Supp. III 1979). The PDA amended Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16 (1976), to clarify Congress' intent that the sex discrimination prohibited by Title VII includes discrimination on the basis of "pregnancy, childbirth or related medical conditions." [3] The PDA provides that "women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . ." The prohibition against discrimination does not require an employer to pay "health insurance benefits" for abortions, except where the life of the mother would be endangered if the fetus were carried to term, or where medical complications arise from an abortion.

Except for the express language allowing an employer to refuse to pay health benefits for abortion, the prohibition against discrimination contained in the PDA is to be read broadly to extend to "the whole range of matters concerning the child-bearing process," including pregnancy, miscarriage, abortions, and childbirth, and to the whole range of employment policies that can adversely affect pregnant workers, including "hiring, reinstatement, termination, disability benefits, sick leave,

---

[3] The Pregnancy Discrimination Act applies to "volunteers serving under . . . the Peace Corps Act" by virtue of § 12 of the Domestic Volunteer Services Act, *as amended,* 42 U.S.C. § 5057(c)(1), with the exception of provisions affording aggrieved individuals a right of appeal to the Merit Systems Protection Board.

medical benefits, seniority and all other conditions covered by Title VII." *See* H.R. Rep. No. 948, 95th Cong., 2d Sess., *reprinted in* 1978 U.S. Code Cong. & Ad. News 4749, 4752-53 (1978 House Report). Any employment practice or policy that treats pregnant employees differently from other disabled workers, with the exception of payment of health insurance benefits for an abortion, is a *prima facie* violation of the Civil Rights Act. *See Harriss* v. *Pan American World Airways, Inc.,* 649 F.2d 670, 673 (9th Cir. 1980); *see generally Dothard* v. *Rawlinson,* 433 U.S. 321, 329 (1977).

The courts have held that the *prima facie* test applies both to facially neutral policies or practices which have a disparate impact on pregnant employees, and policies or practices that single out pregnant employees for disparate treatment. *See, e.g., Harriss,* 649 F.2d at 673. An employer may show that facially neutral policies or practices are justified by and based upon a nondiscriminatory business purpose, although the employee may rebut that showing if other devices that do not have a similar discriminatory effect would serve that business purpose. *See Griggs* v. *Duke Power Co.,* 401 U.S. 424, 431 (1971); *Dothard,* 433 U.S. at 329. Where a policy or practice overtly discriminates against pregnant employees, it may be justified only if the employer can show that the discrimination is "a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e). The federal courts have consistently stated that this exception is "extremely narrow" and requires the employer to demonstrate, for example, that the discrimination is "reasonably necessary to the essence of his business," [4] that he has a "factual basis for believing that all or substantially all [pregnant] women would be unable to perform safely and efficiently the duties of the job involved . . . ," [5] or that it would be "impossible or highly impractical to deal with [pregnant women] on an individualized basis." [6] *See Harriss,* 649 F.2d at 676; *see generally Dothard,* 433 U.S. at 334.

It is important to note that the PDA does not require an employer to treat pregnant employees in any particular manner or to provide particular benefits for pregnant employees. Rather, it prohibits only *discriminatory* treatment that is not fully justified by the particular requirements of the job. Women disabled due to pregnancy, childbirth, or related medical conditions must be provided the same benefits and same employment consideration as those provided to other similarly disabled workers, but need not be provided any greater benefits or consideration. 1978 House Report at 4, 1978 U.S. Code Cong. & Ad. News at 4752. Thus, the initial question is whether the Peace Corps' current

---

[4] *See Usery* v. *Tamiami Trail Tours, Inc.,* 531 F.2d 224, 236 (5th Cir. 1976); *Diaz* v. *Pan American World Airways, Inc.,* 442 F.2d 385, 388 (5th Cir. 1971), *cert. denied,* 404 U S. 950 (1971).

[5] *See Weeks* v. *Southern Bell Tel. & Tel. Co.,* 408 F.2d 228, 235 (5th Cir. 1969); *Diaz,* 442 F.2d at 388.

[6] *See Weeks,* 408 F.2d at 235 n.5.

policies or the possible changes raised by your questions would be consistent with the treatment of other volunteers who are similarly affected in their ability to perform the major functions of their assignments. If any of those policies treats volunteers differently or has the effect of treating volunteers differently because of pregnancy (including volunteers who have abortions), it would be a *prima facie* violation of the PDA. The second level of inquiry would then be whether the discrimination is justified as a bona fide occupational qualification (if the policy discriminates on its face) or by business necessity (if the policy is facially neutral but discriminatory in impact).

### III. Termination and Reinstatement

Under current policy, a Peace Corps volunteer may be separated from service before the end of his or her term for a variety of reasons, most of which involve a discretionary determination by the Country Director that the volunteer's continued effectiveness has been impaired. A volunteer may be terminated, for example, for use of illegal drugs or for excessive use of alcohol. Marriage is a ground for early termination in some instances, for example, if the volunteer marries another volunteer whose term has ended, or if a volunteer marries a dependent non-volunteer and it is determined that the volunteer will be unable to support his or her spouse while in service. Marital separation or divorce is generally cause for reassignment of one volunteer, or, if no other suitable assignment is available, for termination of one volunteer. A volunteer may also be terminated for failure to adjust to the conditions of the assignment, unacceptable personal conduct, inadequate job performance, or lack of a suitable assignment. As noted above, a pregnant volunteer may be separated from service if the Country Director determines that continued service could present a health hazard for the mother or child, if the volunteer will be unable to support the family, or generally if having a child will impair the volunteer's continued effective service. A volunteer who obtains an abortion may be terminated if the Country Director determines she will not be able to serve effectively.

#### A. Pregnancy

We believe that, so long as a decision to terminate a pregnant volunteer is based on an assessment of the volunteer's ability to function effectively in her assignment *after* delivery of the child, the Peace Corps' current policy allowing discretionary termination of pregnant volunteers does not violate the PDA. We base this conclusion on our understanding that the same considerations are applied to any volunteer who has a dependent, including volunteers who have dependent children or spouses prior to entering the Corps, and volunteers who marry dependent spouses during service. The application of this policy, on an

*ad hoc* basis, would thus not have a disparate impact on volunteers who become pregnant during their term overseas, and would not be discriminatory under the PDA. To the extent that the Peace Corps considers the marital status of any volunteer who has dependents as relevant to the volunteer's continued effectiveness in the assignment, we believe the Peace Corps may take into consideration a pregnant volunteer's marital status, and whether her spouse accompanies her in her assignment, in deciding whether termination is appropriate. Similarly, if the Peace Corps as a matter of policy or practice reassigns or terminates volunteers if continued service in a particular assignment would pose a health threat to the volunteer or his or her children, the Peace Corps may reassign or terminate a pregnant volunteer if a bona fide threat to her health or to the health of the child exists.

Under limited circumstances, we believe the Peace Corps could terminate or reassign a volunteer solely because she is pregnant, independent of the considerations outlined above. We can foresee the possibility that in individual cases a volunteer would not be able to function adequately during her pregnancy because of cultural biases in her assigned country. Because of the unique situation of Peace Corps volunteers, who must live and work in the culture of their assigned countries, in such a situation we believe the Peace Corps could exercise its discretion based on the facts of a particular case and remove the volunteer from her assignment. *See, e.g., Dothard,* 433 U.S. at 334 (1977).[7]

While the Peace Corps could terminate pregnant volunteers on a case-by-case basis for the reasons outlined above, we do not believe that the Peace Corps could, as a matter of overall policy, terminate pregnant volunteers solely because they become pregnant. Some recent decisions of lower federal courts have upheld policies requiring women to take mandatory leave beginning in the early stages of pregnancy, but those decisions turn on the narrow ground that continued employment of the woman during her pregnancy could pose a safety risk to co-workers and the public.[8] We have not been informed of a comparable factual basis that would justify an across-the-board policy of terminating pregnant volunteers. In fact, the Peace Corps' historic experience with pregnant volunteers who remain in service might undermine, if

---

[7] We would caution that the Peace Corps should remain evenhanded in application of its policies. Thus, to the extent that the Peace Corps can accommodate volunteers with dependents, for example by choice of assignments or personal leave, or reassigns volunteers if necessary to avoid cross-cultural concerns, it must extend the same consideration to volunteers who become pregnant and have children while in service.

[8] These cases have involved policies of major airlines requiring stewardesses to take mandatory leave upon learning of their pregnancy, or after the first few months of pregnancy. *See, e.g., Harriss,* 649 F.2d at 677; *Burwell* v. *Eastern Air Lines, Inc.,* 633 F.2d 361, 370 (4th Cir 1980), *cert. denied,* 450 U.S. 965 (1981); *Dothard,* 433 U.S at 336-37 ("male-only" requirement for prison guards in "contact" positions allowed because of unique security and control problems in Alabama prisons).

not preclude, an argument that such a policy is justified, even by the unique demands of the Peace Corps.

## B. Abortion

We doubt that the Peace Corps would be able to make a showing under the PDA that would permit it to terminate a volunteer because she elects to have an abortion, so long as other volunteers who undergo surgery of a comparable nature are permitted to return to their assigned countries. The legislative history of the PDA and implementing guidelines promulgated by the Equal Employment Opportunity Commission (EEOC) state in categorical terms that a woman's decision to have an abortion cannot be the basis for termination of employment. *See* House Report at 7, 1978 U.S. Code Cong. & Ad. News at 4755 ("[N]o employer may, for example, fire . . . a woman simply because she has exercised her rights to have an abortion."); 29 C.F.R. Part 1604 (Appendix). Moreover, the experience of the Peace Corps with volunteers who have had abortions and have returned to service would substantially undermine any argument that a volunteer who has had an abortion would be unable to perform effectively. This would not necessarily preclude the Peace Corps from reassigning a volunteer who has had an abortion if women who have abortions are ostracized or otherwise condemned by the culture of her assigned country. That circumstance could justify removal of the volunteer from her assignment, if her continued effective service would be substantially impaired by that cultural bias (assuming the fact of her abortion were public knowledge). However, such circumstances may be rare, and might be grounds only for reassignment of the volunteer, not for termination.

We do not believe that under the PDA the Peace Corps could justify a refusal to rehire a volunteer who had been terminated because of pregnancy and subsequently chose to have an abortion. Even if the ostensible reason for the refusal to rehire that volunteer were to avoid disruption caused by repeated breaks in service, or because of questions raised about the volunteer's commitment to serve her full term,[9] it would be difficult to overcome the inference that the volunteer was accorded different consideration in the employment decision because she became pregnant and chose to have an abortion, and might become pregnant and choose to have an abortion again in the future. One of the primary purposes of the PDA revealed in its legislative history is to prevent employers from acting on the basis of such stereotypes, *i.e.,* that all women of child-bearing age are "potentially pregnant." *See* 1978 House Report at 6-7, 1978 U.S. Code Cong. & Ad. News at 4754–55; *Weeks,* 408 F.2d at 235-36. Thus, we conclude that under the PDA

---

[9] Among the standards of selection for Peace Corps volunteers is "[m]otivation indicating commitment to serve a full term (usually 2 years) as a volunteer despite periods of stress." 22 C.F R. § 305.3(a).

the fact that a volunteer chose to have an abortion cannot be considered in a decision on her reapplication for service.

### III. Reimbursement of Expenses

You have also asked whether the Peace Corps must, or indeed can, consistent with the PDA and current restrictions on the use of appropriated funds, continue to pay travel costs and a per diem for volunteers who obtain an abortion while in service. The Peace Corps now pays those costs under a general policy providing for evacuation to the United States of volunteers who require "elective (necessary but not emergency) surgery of any consequence."[10] Until the beginning of FY 1979, the Peace Corps also paid for the costs of the abortion procedure itself. In 1978, Congress included language in the Peace Corps' appropriations legislation limiting the use of appropriated funds for abortions. We understand that the currently effective language is contained in Pub. L. No. 96–536, § 109, 94 Stat. 3166, 3170 (1980), and prohibits the use of funds "to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for victims of [reported] rape or incest . . . or for medical procedures necessary for the termination of an ectopic pregnancy."

On its face, this restriction covers only payments made "to perform abortions"; it does not prohibit the use of funds to pay expenses, such as a per diem or travel expenses, that are incidental to the abortion. We believe that the plain language of the appropriations restriction is dispositive, and does not require the Peace Corps to cease payment of incidental expenses other than the costs of the abortion itself.[11]

This does not, however, dispose of the question whether the Peace Corps, in its discretion, may cease payment of travel and per diem expenses for volunteers who elect to have abortions. The statutory authority for payment of those expenses vests broad discretion in the President or his delegated representative to authorize "such health care

---

[10] The current policy set forth in the Peace Corps manual identifies a number of other factors that require evacuation to the United States, including: difficult diagnostic problems; cases requiring difficult treatment; psychiatric problems that are the primary reason for evacuation or that threaten to complicate the medical management of the case; cases involving a long recuperative period; and cases that can be handled more effectively and at lower cost in the United States than at an intermediate point. Evacuation to intermediate locations is suggested for a number of other problems, including: emergency surgery, elective surgery requiring short-term hospitalization or treatment on an outpatient basis; specialist consultations, simple orthopedic procedures; and treatment if a long recuperative period is not anticipated.

[11] Moreover, as we note below, any broader interpretation of the appropriations restriction would conflict directly with the requirements of the PDA. This inconsistency would raise a substantial question of congressional intent, because the latter-passed bill (the appropriations legislation) does not address the continuing applicability of the PDA. In general, repeals by implication are not favored, especially when the subsequent legislation is an appropriations measure. *See, e.g., TVA v. Hill,* 437 U.S. 153, 189–90 (1978). To the extent possible, therefore, we must interpret the restriction on the Peace Corps' appropriated funds consistently with the PDA—*i.e.,* to prohibit only the use of funds to pay for the abortion procedure itself

357

. . . as [is] necessary or appropriate." 22 U.S.C. § 2540(e). We believe this authority is broad enough to allow termination of such payments. It must, however, be read in light of the non-discrimination requirements of the PDA.

We conclude that under the PDA the Peace Corps must continue to pay travel and per diem expenses for volunteers evacuated to have an abortion, so long as it provides such compensation for other volunteers evacuated for comparable medical conditions. As noted above, the PDA expressly exempts from its coverage payment of "health insurance benefits for abortion," except where the life of the mother would be endangered or "medical complications" arise. Because the Peace Corps in effect acts as a self-insurer for the volunteers, this exclusion is consistent with the restriction on use of appropriated funds discussed above.[12] However, the legislative history of the PDA makes it clear that Congress intended the exclusion of abortion benefits to be limited to benefits for the abortion itself, and not to include incidental benefits available to employees with comparable temporary disabilities. The amendment excluding abortion benefits from the scope of the PDA was adopted during consideration of the bill by the House Education and Labor Committee. The version adopted by the House Committee, and subsequently by the House, provided as follows:

> As used in this subsection, neither 'pregnancy' nor 'related medical conditions,' as they relate to eligibility for *benefits under any health or temporary disability insurance or sick leave plan* available in connection with employment, may be construed to include abortions, except where the life of the mother would be endangered if the fetus were carried to term . . . .

124 Cong. Rec. 21,435 (1978) (emphasis added). As drafted, the bill would have permitted an employer to deny not only payment for the abortion itself, but also incidental benefits such as sick leave and disability. *Id.* at 21,436 (remarks of Rep. Hawkins). The Senate version of the bill contained no exclusion for abortion benefits.

In conference, a compromise was reached on the language that appears in the enacted bill. Senator Javits' remarks on the floor in support of the conference report clearly indicate that the intended scope of the exclusion was narrow:

> [T]he conferees have adopted a compromise which requires the provision of sick leave and disability benefits in

---

[12] Although the language of the PDA refers only to "health insurance benefits," the legislative history indicates that the underlying concern was that employers would be required to *pay for* abortions (whether directly or through insurance plans), even if that employer harbored religious or moral objections to abortions. *See* 1978 House Report at 7, 1978 U.S. Code Cong. & Ad. News at 4755.

connection with an abortion on the same basis as for any other illness or disabling condition.

On the other hand, employers are not in any case required to provide health insurance benefits for the performance of the abortion procedure itself. . . .

\* \* \* \* \*

Finally, since the abortion proviso specifically addresses only health insurance, the proviso in no way affects an employee's right to sick pay or disability benefits or, indeed, the freedom from discrimination based on abortion in hiring, firing, seniority, or any condition of employment other than medical insurance itself.

124 Cong. Rec. 36,818–19 (1978) (remarks of Senator Javits).

Thus, it is clear that, while an employer may refuse to pay the *costs* of the abortion, under the PDA that employer cannot refuse to provide to women who elect to have an abortion other benefits that are available to temporarily disabled workers. Here, the Peace Corps' evacuation policy, including the payment of travel expenses and a per diem allowance, is such an incidental benefit, and must be extended to volunteers who elect to have an abortion. We believe that the Peace Corps must also continue to allow volunteers to draw on their accumulated readjustment allowance in order to pay for the abortions if they so desire, so long as other volunteers are allowed similar access to cover medical expenses not otherwise covered by the Peace Corps.[13] This would not preclude the Peace Corps from altering its current reimbursement policy to provide, for example, for evacuation to an intermediate location, or to eliminate or reduce per diem payments, provided the amended policy applies across the board to all temporarily disabled workers, and not just to volunteers who become pregnant or have an abortion.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[13] We do not believe that allowing volunteers to use those funds would contravene the restriction on the Peace Corps' use of appropriated funds "to perform abortions." Although the readjustment allowance is not required to be paid to the volunteer until the end of his or her term of service, those funds are effectively held for the account of the volunteer and are taxable to the volunteer as accrued. *See* n.2 *supra.* Thus, withdrawal from those funds to pay the costs of an abortion would not be payment from funds appropriated generally for the Peace Corps, but rather payment to the volunteer of amounts owing to him or her.